*986 TEXTO COMPLETO DE LA SENTENCIA
Comparece ante nos Centennial de Puerto Rico (Centennial) solicitando la revocación de la resolución dictada por la Junta de Revisión Administrativa del Departamento de Educación (Junta de Revisión) el 26 de junio de 2002 y notificada el 27 de junio de 2002. Mediante dicha resolución, la Junta de Revisión declaró sin lugar la moción de reconsideración presentada por Centennial, confirmando así la adjudicación de la subasta de epígrafe en su totalidad a la Puerto Rico Telephone Company (PRTC). Dicha subasta tenía el propósito de suplir el alambrado intemo, transporte de comunicaciones, acceso a Internet y el apoyo técnico para la red escolar del Departamento de Educación (DE) conocida como el “Proyecto E-Rate Año 5”.
Evaluado cuidadosamente el recurso con su voluminoso Apéndice, al igual que las comparecencias de la Junta de Revisión y la PRTC, resolvemos expedir el auto de revisión solicitado y confirmar el dictamen de la Junta de Revisión.
I
Los días 2 y 3 de diciembre de 2001, el DE publicó en la prensa del país la invitación a subasta número S.F. 2002-014 para el “Alambrado Interno, Transporte de Comunicaciones y Apoyo Técnico para la Red Escolar del Departamento de Educación de Puerto Rico, (E-Rate, Año 5)”. En la misma se solicitaron ofertas de suplidores que estuvieran interesados en proveer varios servicios, los cuales fueron identificados en seis partidas diferentes. Particularmente, se estableció que la contratación para el ofrecimiento de los servicios enumerados en las referidas partidas quedaba sujeta a la aprobación de fondos para el quinto año del proyecto E-Rate. Dada la naturaleza de los fondos federales disponibles para este programa, el DE solicitaría posteriormente los fondos, una vez adjudicada la subasta, fundamentándose en las cotizaciones ofrecidas por el licitador agraciado. Es decir, la contratación para los servicios solicitados en la subasta estaría sujeta a una aprobación posterior de los fondos federales. 
En la Convocatoria original (Request for Proposal (REP) original), el DE requirió a los licitadores que sus propuestas estuviesen orientadas hacia el concepto de “turnkey and complete solution”, es decir, cada licitador debía presentar una solución completa y responsabilizarse enteramente por la totalidad de las partidas. El 6 de diciembre de 2001, se celebró la reunión pre-subasta. Como consecuencia de la misma, se enmendaron varias de las especificaciones a instancia de la Puerto Rico Telephone Company (PRTC), quien posteriormente resultó ser el licitador victorioso, para alegadamente añadir funcionalidad y agilidad al proyecto, y se le hicieron enmiendas a la convocatoria de la subasta. Sin embargo, al día siguiente, el DE, por medio de una comunicación del Director de la Oficina de Sistemas de Información y Apoyo Tecnológico a la Docencia (OSIATID), anunció a la Junta de Subastas que se vio precisado a no solicitar más fondos para el proyecto E- *987 Rate, debido a que éste se encontraba atrasado, lo que impedía el recibo de fondos para etapas posteriores. Como consecuencia de ello, se eliminaron para adjudicación todas las partidas relativas a las escuelas y las superintendencias nuevas (partidas 1, 2 y 3).
El 20 de diciembre de 2001, la Junta de Subastas celebró la apertura de la subasta. Como parte de este proceso, se nombró un Comité Técnico Evaluador para analizar las propuestas formado por cinco profesionales con la competencia profesional necesaria en el campo de las telecomunicaciones. Según la Convocatoria Enmendada, dicho comité debía evaluar, en primera instancia, las propuestas en términos del cumplimiento con las instrucciones y condiciones generales y, después, el de las especificaciones y condiciones especiales. Luego, aquellas propuestas que aprobaran dicha fase pasarían a una segunda etapa de evaluación basada en un sistema de puntaje con un total de 100 puntos. 
El 16 de enero de 2002, al día siguiente de haber sido sometido el informe final del Comité Técnico Evaluador, la Junta de Subastas adjudicó a la PRTC la totalidad de las partidas consideradas, es decir, la 6, 7 y 8. Véase Aviso de Adjudicación, Apéndice de la Recurrente, págs. 20-30, Exh. A. Surge del récord que la PRTC había recibido la buena pro del DE para algunas partidas de etapas previas del proyecto. 
Oportunamente, el 28 de enero de 2002, Centennial solicitó Reconsideración de la adjudicación ante la Junta de Revisión, organismo intemo revisor del DE facultado para atender los cuestionamientos respecto a las adjudicaciones de subastas. Por su parte, la Junta de Subastas replicó el 6 de febrero de 2002. Luego, el 15 de febrero de 2002, Centennial solicitó hacer descubrimiento de pmeba sobre la ejecutoria pasada de la PRTC en sus contratos anteriores con el DE. A ello se opuso la PRTC mediante escrito del 27 de febrero de 2002. Dicha solicitud fue declarada no ha lugar por la Junta de Revisión el 8 de marzo de 2002, debido a que la información requerida no era pertinente a la controversia ni formó parte del proceso de adjudicación ante la Junta de Subastas. Además, la Junta de Revisión se fundamentó en el hecho de que su propio Reglamento no provee específicamente para el descubrimiento de pmeba, por lo que ésta se limita a revisar exclusivamente a base del récord obrante ante la Junta de Subastas. 
En escrito titulado “Dúplica a Réplicas de la Junta de Subastas Central y la PRTC’ de 1 de marzo de 2002, Centennial trajo a la atención de la Junta de Revisión la existencia de un informe preparado por Arthur Andersen relacionado a las etapas pasadas del proyecto E-Rate. Después de varios incidentes procesales, el 16 de abril de 2002, la Junta de Revisión nuevamente declaró sin lugar el descubrimiento de pmeba solicitado por Centennial.
No obstante lo anterior, el 14 de junio de 2002, Centennial presentó una “Moción Informativa y Solicitud de Vista y/o Reconsideración”. Trajo a la atención de la Junta de Revisión un informe intemo del DE titulado “Informe de Evaluación Red Reeducate” preparado por el Sr. Adonai Ramírez Jiménez el 18 de septiembre de 2001. Centennial adujo que ofrecía dicho informe para demostrar las pobres ejecutorias anteriores de la PRTC en el proyecto E-Rate. Dicho informe fue objetado por la PRTC mediante moción del 21 de junio de 2002 en la cual solicitó que se eliminara del récord.
Así las cosas, el 26 de junio de 2002, la Junta de Revisión emitió la resolución que nos ocupa confirmando la determinación tomada por la Junta de Subastas. Dicha resolución fue notificada el 27 de junio de 2002.
Inconforme con dicha determinación, Centennial recurrió oportunamente ante nos el 8 de julio de 2002, mediante el recurso de revisión del epígrafe. Señaló la comisión por la agencia de los siguientes errores:

“ERRO LA JUNTA DE REVISION AL CONFIRMAR LA JUNTA DE SUBASTAS Y ADJUDICAR LA SUBASTA A PRTC, A PESAR DE QUE NO CUENTA CON UN HISTORIAL CONFIABLE DE CUMPLIMIENTO.

*988
a) Erró la Junta de Revision al declararse sin autoridad para descalificar a PRTC de la subasta de epígrafe.

b) Erró la Junta de Revisión al no tomar en consideración el informe interno que evidencia que el DE, y por ende, la Junta de Subastas, conocía o debió conocer el historial de cumplimiento deficiente de PRTC.

ERRO LA JUNTA DE REVISION AL CONFIRMAR LA JUNTA DE SUBASTAS Y EXCLUIR A CENTENNIAL DE LA PARTIDA “7”, DE MANERA ARBITRARIA Y SELECTIVA, A PESAR DE QUE EL PLIEGO DE SUBASTA ERA AMBIGUO.

ERRO LA JUNTA DE REVISION AL CONFIRMAR A LA JUNTA DE SUBASTAS Y ADJUDICAR LA SUBASTA A PRTC, A PESAR DE QUE SU PROPUESTA NO CUMPLIA CON LAS ESPECIFICACIONES SOLICITADAS EN INSTANCIAS SIGNIFICATIVAS.

ERRO LA JUNTA DE REVISION AL CONFIRMAR A LA JUNTA DE SUBASTAS Y ADJUDICAR LA SUBASTA A PRTC, A PESAR DE QUE SU PROPUESTA NO CUMPLIA CON LAS CONDICIONES Y DEMAS REQUISITOS ESTABLECIDOS EN EL PLIEGO DE LA SUBASTA.

ERRO LA JUNTA DE REVISION AL CONFIRMAR A LA JUNTA DE SUBASTAS Y ADJUDICAR LA SUBASTA A PRTC, A PESAR DE QUE SU PROPUESTA NO ERA LA MEJOR OFERTA. ”
En síntesis, Centennial apoya su solicitud de revisión sobre varias premisas, a saber: que la PRTC no posee un buen historial de capacidad y cumplimiento; que su oferta no cumplió con las especificaciones y condiciones de la subasta emitida por el DE; y que la oferta de la PRTC no fue la del mejor postor. Aduce, además, que la determinación tomada por la Junta de Revisión es contraria al Artículo 56 del Reglamento de Compras, Ventas y Subastas de Bienes, Obras y Servicios no Personales del Departamento de Educación (Reglamento de Compras), y finalmente, que dicha adjudicación resulta lesiva a los intereses de la educación en Puerto Rico.
El 22 de agosto de 2002, emitimos resolución ordenando a la parte recurrida, la PRTC y la Junta de Subastas, presentar sus respectivos memorandos de oposición en el término de treinta días, lo cual éstas cumplieron. No obstante, el 26 de agosto de 2002, la PRTC presentó una moción solicitando la desestimación del recurso porque la recurrente no incluyó ciertos documentos. alegadamente esenciales en el Apéndice. Centennial se opuso mediante moción presentada el 27 de septiembre de 2002.
Perfeccionado el recurso, pasamos a resolver el mismo en los méritos, no sin antes atender el cuestionamiento jurisdiccional esbozado por la recurrida PRTC. Véáse Arriaga v. F.S.E. 145 D.P.R. 122, 127 (1998); Autoridad Sobre Hogares v. Segastivelza, 71 D.P.R. 436 (1950).
II
La PRTC fundamenta la falta de jurisdicción de este foro en la omisión de Centennial al no incluir en el Apéndice el escrito presentado por la Junta de Subastas Central titulado “Reacción a Moción Informativa y Solicitud de Vista y/o Resolución” (Anejo 1 de la Moción de Desestimación). En dicho escrito, la Junta de Subastas solicita que se declare No Ha Lugar a la Reconsideración de Centennial ante la Junta de Revisión.
Sostiene la PRTC que dicho documento es “esencial para conocer la posición de la Junta de Revisión en. cuanto a considerar documentos que no estuvieran ante su consideración al momento de adjudicar la subasta y que Centennial alega eran medulares en la adjudicación”. Moción de Desestimación, a la pág. 3.
Por otro lado, Centennial alega en su oposición a la desestimación que dicho documento nunca fue notificado a la representación legal de Centennial, y aunque las disposiciones reglamentarias de la Junta de *989 Revisión nada disponen al respecto, la notificación del documento aludido debe considerarse como “a priori defectuosa y, por ende, el Escrito no debe tener efecto alguno y se debe tener por no presentado”. Oposición a Moción de Desestimación, a la pág. 3. Concluye, además, que resulta imposible incluir en el Apéndice un documento que no había sido notificado a los abogados y del cual no tenían conocimiento.
Como es sabido, los abogados están obligados a cumplir fielmente con el trámite prescrito en, nuestro Reglamento para el perfeccionamiento de los recursos, no quedando a su arbitrio la decisión de cuáles disposiciones reglamentarias deben acatar y cuándo. El Reglamento de este Tribunal, como requisito de todo recurso, requiere la presentación de un Apéndice que contenga copias literales de los documentos esenciales para sustentar el recurso. Respecto a las revisiones de decisiones administrativas, la Regla 59E del Reglamento, en su parte pertinente, dispone que el Apéndice incluirá una copia literal de: “(a) Las alegaciones de las partes ante la agencia, a saber: la solicitud original, la querella o la apelación, las contestaciones a los anteriores hechos por las demás partes. ...”. Regla 59(E)(1)(a) del Reglamento del Tribunal de Circuito de Apelaciones, 4 L.P.R.A. Ap. XXII-A. También precisa que el Apéndice sólo debía contener "... copias de documentos que formen parte del expediente original ante el foro administrativo.” Regla 59(E)(2) del Reglamento. Por último, éste deberá incluir “cualquier otro documento que forme parte del expediente original en la agencia y que pueda serle útil al Tribunal de Circuito de Apelaciones en la resolución de la controversia. ” Regla 59(E)(1)(f). Véase también la Regla 74 de nuestro Reglamento. En Codesi v. Municipio de Canóvanas, Opinión de 24 de marzo de 2000, 2000 J.T.S. 61, 150 D.P.R._(2000), el Tribunal Supremo resolvió que la omisión de incluir los anteriores documentos acarrea la desestimación del recurso.
No empece a lo anterior, recientemente, en Andrés Román Velázquez v. Andrés Román Hernández, Opinión Per Curiam de 24 de septiembre de 2002, 2002 J.T.S. 132; 157 D.P.R._(2002), el Tribunal Supremo resolvió que: “[c]omo regla general, el mecanismo procesal de la desestimación como sanción debe utilizarse como ultimo recurso. Por consiguiente, cuando el Tribunal [de Circuito de Apelaciones] utiliza dicho mecanismo procesal en casos de incumplimiento con su Reglamento, debe cerciorarse primero que el incumplimiento haya provocado un impedimento real y meritorio para que el Tribunal pueda atender el caso en los méritos. ”
Aplicados los principios antes expuestos al caso ante nos, concluimos que la omisión de Centennial al no incluir el escrito de la Junta de Subastas Central no es de tal naturaleza que nos impida realizar nuestra función revisora. El no incluir en el Apéndice la “Reacción a Moción Informativa y Solicitud de Vista y/o Resolución”, no nos obstaculiza la resolución del recurso ante nuestra consideración, al punto de no poder emitir una decisión fundamentada. Adviértase que la función de este Tribunal es revisar estrictamente la Resolución de la Junta de Revisión emitida el 26 de junio de 2002 a base de los documentos que obran en el Apéndice y el derecho aplicable. Ciertamente, no resulta esencial e indispensable para este Tribunal examinar los fundamentos de la Junta de Subastas en esa etapa de los procedimientos. Por lo tanto, declaramos no ha lugar la desestimación del recurso según solicitada por la PRTC.
III
Como cuestión de umbral, reafirmamos el principio de que a toda determinación administrativa le cobija una presunción de legalidad y corrección. E.L.A. v. Lucas Malavé h/n/c Supermercado Jardines de Caparra, _D.P.R._(2002), 2002 J.T.S. 103. Dicha presunción deberá sostenerse por los tribunales, a menos que la misma logre ser derrotada. A.R.P.E. v. Junta de Apelaciones Sobre Construcciones y Lotificaciones, 124 D.P. R. 858, 864 (1989); Henríquez v. Consejo de Educación Superior, 120 D.P.R. 194, 210 (1987); Murphy Bernabé v. Tribunal Superior, 103 D.P.R. 692, 699 (1975). Ello, debido a que las agencias administrativas poseen la experiencia y conocimientos altamente especializados sobre los asuntos que están dentro del ámbito de sus facultades y responsabilidades. Fac. C. Soc. Aplicadas, Inc. v. C.E.S., 133 D.P.R. 521, 533 (1993); Asoc. Drs. Med. Cui. Salud v. Morales, 133 D.P.R. 567, 589 (1993).
*990 En vista de lo anterior, resulta que toda intervención con dichas determinaciones sólo estará justificada cuando la agencia haya obrado arbitraria, ilegalmente, o en forma tan irrazonable que su actuación constituya un abuso de discreción. Del mismo modo, se intervendrá cuando la determinación no pueda ser sostenida a la luz de la doctrina de la evidencia sustancial. Mun. de San Juan v. J.C.A., 2000 J.T.S. 193, 152 D.P.R._(2000); Misión Industrial de P.R., Inc. v. Junta de Planificación, 146 D.P.R. 64, 131 (1998); Fuertes v. A.R.P.E., 134 D. P.R. 947, 953 (1993); Murphy Bernabé v. Tribunal Superior, 103 D.P.R. 692, 699 (1975).
El principio de la evidencia sustancial limita la intervención judicial con las determinaciones de hechos de un organismo administrativo, en la medida en que éstas estén sostenidas por evidencia sustancial que surja del expediente administrativo, considerado en su totalidad. Metropolitana, S.E. v. A.R.P.E., 138 D.P.R. 200, (1995); Puerto Rico Telephone Co. v. Unión Independiente, 131 D.P.R. 171, 211 (1992).
El principio jurisprudencial de la evidencia sustancial fue acogido en la sección 4.5 de la Ley de Procedimiento Administrativo Uniforme (L.P.A.U.), Ley Núm. 170 del 12 de agosto de 1988, según enmendada, 3 L.P.R.A. see. 2175. Dicha sección dispone, en lo pertinente, que "...las determinaciones de hechos de las decisiones de las agencias serán sostenidas por el Tribunal, si se basan en evidencia sustancial que obre en el expediente administrativo". A estos fines, se ha definido como “aquella [prueba] pertinente que una mente razonable pueda aceptar como adecuada para sostener una conclusión”. Ramírez v. Departamento de Salud, 147 D.P.R. 901, 905 (1999); Associated Insurance v. Comisionado de Seguros, 144 D.P.R. 425, 437 (1997); Hilton Hotels v. Junta de Salario Mínimo, 74 D.P.R. 670, 687 (1953).
La determinación judicial de que no existe evidencia sustancial que sostenga las determinaciones de la agencia administrativa conlleva que la parte afectada demuestre que existe “otra prueba en el récord que razonablemente reduzca o menoscabe el peso de tal evidencia hasta el punto de que un tribunal no pueda concienzudamente concluir que la evidencia sea sustancial, en vista de la prueba presentada... y hasta el punto que se demuestre claramente que la decisión [del organismo administrativo] no está justificada por una evaluación justa del peso de la prueba” que le fue sometida. Metropolitana v. A.R.P.E., supra, a la pág. 213, (citando a Hilton Hotels v. Junta de Salario Mínimo, supra).
Respecto a las subastas, por otro lado, se ha resuelto que éstas tienen el objetivo principal de obtener el mejor contrato posible para el Estado. Mármol Co. Inc. v. Adm. Servicios Gens., 126 D.P.R. 864 (1990). Las mismas van dirigidas a lograr eficacia, honestidad y corrección para proteger el interés público a través de la competencia libre y transparente entre licitadores. RBR Construction S.E. v. Autoridad de Carreteras, 2000 J.T. S. 7; 149 D.P.R._(2000); Hatton v. Municipio de Ponce, 134 D.P.R. 1001 (1994); Mármol Co. Inc. v. Adm. Servicios Gens., supra.
Además, se ha reiterado que a pesar de que las subastas son procedimientos informales sui generis con ciertas características adjudicativas, la parte adversamente afectada por la determinación tiene derecho a la revisión judicial de acuerdo al ordenamiento dispuesto en la L.P.A.U. Velázquez v. Administración de Terrenos, 2001 J.T.S. 35; 153 D.P.R._(2001). Ello debido, desde luego, a que la adjudicación de las subastas se encuentra subordinada a los principios de derecho administrativo antes expuestos.
Así pues, los tribunales han exigido que la agencia incluya los fundamentos sobre los que descansa su determinación, de modo que el tribunal pueda ejercer su función revisora. Véase Rivera Santiago v. Srio. de Hacienda, 119 D.P.R. 265, 272 (1987); Godreau & Co. v. Com. Servicio Público, 71 D.P.R. 649, 655-657 (1950). De igual forma, se ha resuelto que las determinaciones administrativas deben ser finales para poder ser revisadas por los tribunales. Constructora Celta v. Autoridad de los Puertos, 2002 J.T.S. 1; 155 D.P.R._ (2001).
En L.P.C.& D., Inc. v. Autoridad de Carreteras y Transportación, 2000 J.T.S. 9; 149 D.P.R._(2000), *991 se dijo: “[L]a notificación de la adjudicación de una subasta debe ser fundamentada, al menos de una forma sumaria y sucinta. Por lo menos debe incluir la siguiente información: los nombres de los lidiadores en la subasta y una síntesis de sus propuestas; los factores o criterios que se tomaron en cuenta para adjudicar la subasta; los defectos, si alguno, que tuvieran las propuestas de los lidiadores perdidosos, y la disponibilidad y el plazo para solicitar la reconsideración y la revisión judicial.” 2000 J.T.S. 9, a la pág. 477.
En particular, la adjudicación de subastas está regulada por la sección 3.9 de L.P.A.U., 3 L.P.R.A. see. 2169. Dicha sección dispone que las subastas se regirán por procedimientos informales y que su reglamentación y términos serán establecidos por cada una de las agencias, quienes tendrán discreción para adoptar reglamentos sobre el procedimiento a seguir para las respectivas subastas. RBR Construction v. Autoridad de Carreteras, supra.
Cada reglamento debe incluir, en particular, los factores específicos que se han de utilizar para evaluar las propuestas de subastas. Entre los más reconocidos por la jurisprudencia, se encuentran los siguientes: (1) que las propuestas sean conformes a las especificaciones de la subasta; (2) la habilidad del postor para realizar y cumplir con el contrato; (3) la responsabilidad económica del licitador, su representación e integridad comercial, entre otros. Continental Const. Corp. v. Municipio de Bayamón, 115 D.P.R. 559 (1984).
A tenor con los preceptos arriba expuestos, y conforme a la Ley Orgánica del Departamento de Educación, Ley Núm. 68 del 28 de agosto de 1990, según enmendada, y la Ley para el Desarrollo de las Escuelas de la Comunidad, Ley Núm. 18 de 16 de junio de 1993, según enmendada, el DE promulgó su “Reglamento de Compras, Ventas y Subastas de Bienes, Obras y Servicios No Personales del Departamento de Educación” (el Reglamento de Compras) el 15 de mayo de 1996. Se creó con el propósito de “agilizar, controlar y economizar en las compras, ventas, y subastas del Departamento de Educación”. Artículo 1, Preámbulo.
El Capítulo XIV del Reglamento de Compras trata sobre la adjudicación de subastas. En su artículo 56, titulado “ELEMENTOS PARA CONSIDERAR PARA LA ADJUDICACION’, establece los elementos a ser tomados en consideración para la adjudicación de una subasta. Por su importancia para la resolución del caso de autos, transcribimos dicho artículo en su totalidad:

“§56.1- Normas Generales de Adjudicación

Al adjudicar las subastas, la Junta se atendrá, en primera instancia, a la siguiente y única forma general de adjudicación:

§56.1.1 La adjudicación de las subastas de adquisición se hará a favor del licitador que esté respaldado por un buen historial de capacidad y cumplimiento, que lleve al ánimo de la Junta la seguridad de que cumplirá con los términos del contrato que en su día se otorgue, siempre y cuando su oferta reúna, en el orden establecido, los siguientes requisitos:

§56.1.1.1. Que cumpla con las especificaciones.

§56.1.1.2.Que cumpla con las condiciones y demás requisitos establecidos en el pliego de la subasta.

§56.1.1.3. Que sea la mejor oferta.

§56.1.1.4. Descuentos ofrecidos por rapidez en los pagos, no se considerarán para efectos de la adjudicación.

§56.2 - Normas para la adjudicación de Subastas de Ventas

*992
Las subastas de venta se adjudicarán a favor del postor cuya oferta sea la más alta y razonable en relación con la tasación correspondiente del bien, obra o servicio a vender:

§56.3- Evaluación de las Ofertas

La Junta tendrá que determinar, en primera instancia, qué ofertas son susceptibles de ser consideradas para adjudicación, tomando como guía las normas establecidas en este Reglamento y la información contenida en el Acta de Apertura. Para tomar esta determinación, evaluará las especificaciones y condiciones contenidas en el pliego de subastas y las propuestas por los licitadores. En segundo lugar, tendrá que considerar siempre la diferencia en precios de tas ofertas de los licitadores antes de hacer la recomendación; tomará que cuenta asimismo cada una de las condiciones o particularidades que cada lidiador incluyó en su oferta, que puedan afectar su licitación. ” (Enfasis nuestro).
Por otra parte, el Artículo 57 del Reglamento de Compras reza:

“Artículo 57: Recomendación

Al hacer una recomendación a favor de un licitador, la Junta tendrá que indicar en el Acta las razones específicas por las que prefiere darle la adjudicación de la subasta a un lidiador. ” (Enfasis nuestro).
Además, el Artículo 59 establece los siguientes criterios pertinentes en el área de adjudicación. Dispone dicho artículo que:

“Al evaluar las ofertas ante su consideración, la Junta podrá encontrar una serie de ofertas que no se atienen a la directriz general establecida, pero que podrían ser susceptibles de evaluación sujeto a unos controles. Las siguientes reglas se adoptan para ofrecerle a la Junta las guías que tendrán que seguir en determinadas circunstancias.

§59.1 Desviaciones Menores en la Oferta

La Junta podrá excusar u obviar cualquier informalidad o irregularidad menor en la oferta, tales como: desviaciones de las especificaciones, términos o condiciones, que ajuicio de la Junta no estén en conflicto con el uso, precio, propósito, funcionamiento y calidad de los artículos o servicios, y a la. sana competencia, siempre que con ello se beneficie el Departamento y se salvaguarden los intereses y necesidades del Area Adquirente. ”

A la luz de la normativa arriba expuesta, pasamos a atender cada uno de los errores imputados a la agencia por Centennial.
IV
En el primer error señalado, Centennial reclama que la PRTC no contaba con un historial confiable de cumplimiento según lo requiere el Artículo §56.1.1. del Reglamento de Compras del DE. Expone que el DE “conocía durante todo el proceso presubasta y al momento de adjudicar la misma que la PRTC tenía un historial deficiente de cumplimiento en ese mismo proyecto. ” Solicitud de Revisión, pág. 9.
Para sustanciar dicho planteamiento, en primer lugar, Centennial llama la atención a una transcripción literal de las expresiones vertidas en el propio aviso de adjudicación de la subasta (Apéndice de la Recurrente, pág. 22, Exh. A) que hacen referencia, a su vez, a una carta del Sr. Adonai Ramírez Jiménez, Oficial Principal de Informática y Director de OSIATD. Dichas expresiones rezan:

*993
‘‘DETERMINACION DE AREAS A NO CONSIDERARSE EN EL AÑO 5 DEL PROYECTO DE ERATE (SIC) CONSIDERADAS EN LA PROPUESTA SF-2002-014

Habiendo realizado el análisis del desarrollo y estado de REEDUATE (SIC) bajo el proyecto Erate (SIC) hemos verificado que el proyecto no ha sido completado en un grado aceptable. Mediante nuestra evaluación, validamos únicamente 216 escuelas conectadas operacionalmente. Esto equivale al 14.03% del total de escuelas participando en este proyecto.

Por lo antes expuesto, hemos determinado que no solicitaremos fondos para el desarrollo de nuevas etapas de crecimiento hasta que las etapas en desarrollo hayan alcanzado un grado de desempeño operacional aceptable.

Dadas estas circunstancias, nos vemos obligados a solicitar a la Junta de Subastas Central que no adjudique las siguientes partidas en su determinación final sobre la subasta de referencia:

1. Telecommunications Infrastructure for 103 New Schools

2. Internal Connections for 103 New Schools

3. Internet Access for 103 New Schools.

De igual forma, le solicitamos al comité técnico que evalúa las propuestas que no considere estas partidas en su evaluación final de esta subasta. (Enfasis suplido)”

Analizadas dichas expresiones, a la luz de la totalidad del expediente ante nos, somos del criterio que éstas no constituyen base razonable que haya podido inducir a la Junta de Revisión a concluir que existe un historial deficiente de cumplimiento por parte de la PRTC, y por consiguiente, se configura una violación al Reglamento de Compras del DE. De dichas propias manifestaciones se desprende que no fueron hechas con el propósito de establecer incumplimiento, y menos aún, de culpar expresamente a la PRTC por ello. Es nuestra interpretación que, más bien, tales palabras atribuidas al DE fueron emitidas con el propósito de expresar, en términos generales y sin adjudicar culpa, las razones por las cuales se debían eliminar ciertas partidas de la subasta, dado el hecho no controvertido, del atraso del proyecto E-Rate. Resulta, pues, incorrecto y éticamente cuestionable utilizar dichas expresiones fuera del contexto en que fueron redactadas como evidencia contundente de incumplimiento por parte de la PRTC. Además, abona a nuestra conclusión que, cónsono con el expediente ante nos, en ningún momento del procedimiento se invocó el alegado incumplimiento de la PRTC como cuestión de hecho por quien sería el verdadero perjudicado por dicha acción, es decir, el DE.
En la resolución recurrida, la Junta de Revisión discutió la improcedencia de utilizar las expresiones del Sr. Ramírez Jiménez como prueba de incumplimiento. Concluyó que:
“Las razones para que solamente un 14.3% de las escuelas conectadas estén participando operacionalmente no se expresan. Mucho menos se coloca la responsabilidad de esta situación en PRTC o en cualquier otro de los licitadores que comparecieron a las subastas. En ese documento, que es lo único con que cuenta la Junta para poder inferir que ha habido un incumplimiento, no surgen los factores que -pueden ser muchos y de naturaleza variada-, ocasionaron que las etapas anteriores del proyecto se hayan atrasado. ” (Enfasis nuestro).
Hemos analizado detenidamente el planteamiento de Centennial en este aspecto y no encontramos arbitrariedad o abuso en la interpretación que la Junta de Revisión hace respecto a lo vertido en la comunicación en tomo al informe de OSIATLD, por lo que concurrimos con ella. Dicho informe no tiende a probar de forma alguna el alegado historial de incumplimiento evidenciado por la PRTC.
*994 En segundo lugar, Centennial apoya el primer error en el informe fechado el 17 de octubre de 2001 preparado por la firma Arthur Andersen para Universal Service Administrative Compány (USAC). Apéndice de la Recurrente, págs. 429-450. Dicho informe nunca formó parte del expediente administrativo ante la Junta de Revisión, ya que el mismo se presentó por primera vez luego de adjudicada la subasta, es decir, en la etapa de reconsideración de la determinación administrativa. Véase Apéndice de la Recurrente, pág. 460, Réplica a Solicitud de Revisión.
Empero, procedemos a considerar los planteamientos de Centennial en relación con dicho informe y el alegado incumplimiento de la PRTC. Según aduce la recurrente dicho informe alegadamente indica el desembolso por parte del DE de una cantidad menor de dinero (cerca de los $20 millones de dólares), por razón de que los servicios de Internet no fueron completados a tiempo por razones atribuibles a la PRTC. Centennial resalta las siguientes expresiones de dicho informe:
“The total committed amount approved for all four FRNs [Funding Request Numbers] was $46,222,682 (discounted portion). Disbursements were only made for the internal connection and telecommunications FRNs. No services were obtained under the FRN for Internet service since internal connections were not completed in time to utilize these services. As a result, as of May 11, 2000, only $21.7 million of the approved amount of $46.2 million was disbursed for the 11 Service Provider Invoices (“SPI”) issued. ” Apéndice de la Recurrente, pág. 444.
Además, respecto a la instalación de líneas T-l, el informe señaló:

“During our view of disbursements, we noted that for one vendor, the PRTC, only 745 of the 760 schools covered under the contract had the funded equipment installed; and only 359 of the 760 schools had a T-l line installed by September 30, 1999. As a result, the installation charges invoices were reduced by $745,393from the original contracted amount. However, due to lack of sufficient detail provided within both the contract and the PRTC invoices, we were unable to verify whether this price reduction was consistent with the reduction in the scope of work performed. ”

Acorde con lo antes citado, Centennial señala que mediante las aludidas expresiones se establecen claramente ciertos extremos que constituyen información “pertinente y contundente” a su posición. Solicitud de Revisión, pág. 12. Expresa que sólo el 53% de las líneas T-l se habían instalado para la fecha límite; que la PRTC “sobre facturó” por la cantidad de $745,393.00 y que las facturas sometidas tuvieron que ser reducidas por el DE; que el informe carece de información suficiente para determinar si tales reducciones o ajustes procedían en las cantidades efectuadas de acuerdo al trabajo realizado por PRTC. Solicitud de Revisión, Id.
Analizados cuidadosamente los argumentos esbozados por Centennial, somos del criterio que si bien es cierto que el informe establece el hecho no controvertido de que la PRTC no instaló a tiempo cierta cantidad de líneas T-l acorde a lo previamente pactado por ésta con el DE, el mismo tampoco puede utilizarse como prueba sustancial que evidencie un patrón de incumplimiento. Precisamente, por carecer de datos adicionales y así mismo expresarlo, el propio informe de Arthur Andersen no establece, ni pretende establecer de modo alguno, lo que Centennial alega sobre la apropiación indebida de dinero o la sobrefacturación alegadamente imputable a la PRTC. Dichas alegaciones, de hecho, se desvanecen ante el propio informe, el cual corrobora la política del DE de que, dado el origen federal de los fondos del proyecto, el desembolso de los mismos se efectúa únicamente luego de presentadas las certificaciones del trabajo ya realizado.
Además, del propio informe surgen menciones positivas a la ejecutoria de la PRTC. Véase, además, el Memorando de Oposición a la Solicitud de Revisión, pág. 8. Allí, la parte recurrida acertadamente señala que de los 18 beneficiarios del programa E-Rate objeto de la auditoría, sólo uno fue referido a la Sección de Fraude Empresarial y Servicios Investigativos de Andersen, y dicho referido ciertamente no fue para el DE. Véase Apéndice de la Recurrente, pág. 436, pág. 2 del Informe.
*995 Concluimos de nuestro análisis que el informe no constituye prueba sustancial que establezca, según postula Centennial, el patrón de incumplimiento en violación del Artículo 56 del Reglamento de Compras del DE.
En tercer lugar, Centennial intenta traer en esta, etapa de los procedimientos el informe interno del DE preparado el 18 de septiembre de 2001 por el Sr. Adonai Ramírez Jiménez. Apéndice de la Recurrente, págs. 554-626. Aunque la Junta de Revisión nunca llegó a tomar conocimiento oficial de dicho informe, Centennial alega ante nos que la página 27 de dicho informe establece que los trabajos “debieron haber terminado para el 30 de septiembre de 1999 a tenor con lo dispuesto en el contrato entre el DE y PRTC y al verano del 2001 no se había completado este trabajo.” Solicitud de Revisión, pág. 12. Luego de una cuidadosa lectura del informe, no resulta evidente el alegado historial de cumplimiento deficiente que la recurrente imputa a la PRTC. Entendemos que de haber existido algún incumplimiento, el mismo fue considerado porla Junta de Subastas en su justa perspectiva, pues surge del récord administrativo ante nos que ésta adjudicó a la PRTC puntuaciones más bajas que a Centennial en algunos renglones. En particular, encontramos que la Junta de Subastas razonablemente concluyó que procedía reducir la puntuación de la PRTC en cuanto a solución (para las partidas Núm. 5, 6 y 7), y en cuanto a las calificaciones del proveedor (para la partida Núm. 5). Ello, de por sí, demuestra que la Junta de Subastas actuó dentro del marco de razonabilidad esperado al reducir puntos a la PRTC en los renglones correspondientes.
Como parte del primer error, Centennial cuestiona que la Junta de Revisión se declarara “sin autoridad” para descalificar a la PRTC de la subasta. En su dictamen, la Junta de Revisión específicamente concluyó que:
“A base de las argumentaciones de las partes, concurrimos con el planteamiento de la Junta de Subastas Central de que bajo las condiciones y especificaciones de la subasta no existen fundamentos para descalificar a PRTC como licitador por el alegado incumplimiento. Ese proceso tenía que darse antes de la adjudicación y el mismo tenía que estar debidamente fundamentádo.” (Enfasis nuestro).
La Junta de Révisión basó dicha determinación en que el Capítulo X, Artículo 36, relativo al Registro de Licitadores del Reglamento de Compras, lo más que permite es que la Junta solicite al licitador que muestre su capacidad de cumplimiento, pero no le otorga facultad o discreción alguna para descalificar a un licitador dentro del procedimiento formal de adjudicación de subastas.
La Junta de Revisión estimó que bajo las circunstancias de este caso, la comunicación de OSIATID no era suficiente para descalificar a la PRTC como licitador. La Junta finalmente concluyó en cuanto a este extremo lo siguiente: “Si la Junta de Subastas consideró o no estos elementos; o si realizó una determinación sobre la idoneidad de PRTC para prestar el servicio, no corresponde a nosotros determinarlo. Eso fue parte del proceso de análisis de la Junta que la llevó a la adjudicación y lo vamos a respetar. Nuestra función es revisar la determinación de la Junta a base del expediente administrativo ante ese cuerpo.” Apéndice de la Recurrente, pág. 640, Resolución recurrida a la pág. 11.
Centennial alega que la interpretación del Artículo 36 hecha por la Junta de Revisión es “errónea y limita a los funcionarios gubernamentales a aceptar licitadores deficientes por el mero hecho de que se cometió un error, o no se proveyó seguimiento, a la precalificación que se realiza a través de la confección del Registro de Licitadores.” (Enfasis nuestro.) Solicitud de Revisión, pág. 13.
Entendemos que el error señalado no fue cometido. Según se desprende del análisis integrado del Reglamento de Compras con los documentos relativos a la subasta en autos, el proceder correcto para efectuar descalificaciones de licitadores debidamente registrados debe ser previo al proceso adjudicativo. Véase las Condiciones e Instrucciones Generales, RFP enmendada a las págs. 33-34, Apéndice de la Recurrente, págs. 129-130. En la Condición referente a penalidades, se destaca que "... el Departamento se reserva el derecho de excluir del Registro de Licitadores a contratistas que no cumplan con su contrato.” Además, dispone que:
*996 “21. Todo licitador deberá efectuar cualquier expresión o comentario referente a su oferta de cualquier otro licitador durante el acto de apertura de la subasta. Una vez cerrado el acto de apertura, esta Junta no aceptará comunicaciones escritas o verbales de los licitadores en la etapa evaluativa de la subasta, a menos que la Junta así lo solicite. De haber comunicación entre la Junta y el licitador, éste deberá enviar copia a los demás licitadores que participaron en la subasta. ” (Enfasis nuestro).
Al momento de la subasta de autos, el Registro de Licitadores incluia tanto a la PRTC como a Centennial. Tal y como se desprende del Reglamento, los licitadores, como condición para figurar allí registrados, tienen que cumplir con un sinnúmero de condiciones que garantizan su idoneidad para participar en el proceso de subasta. Entre ellas, figura la capacidad de cumplimiento contractual de éstos.
Estimamos que la Junta de Subastas podía razonablemente adjudicar la subasta a cualquiera de los licitadores inscritos en el Registro de Licitadores, ya que la inclusión en el mismo certifica prima facie su capacidad de cumplimiento contractual. Ni el DE, ni cualquier otro licitador, potencialmente afectado por el alegado incumplimiento, objetó la presencia de la PRTC en el Registro de Licitadores en el procedimiento formal, razón por la cual, no vemos porqué debamos sustituir las conclusiones de la Junta de Subastas. Surge del récord que dicho organismo actuó conforme a las constancias del Registro de Licitadores, y cuando ninguno de los posibles perjudicados por el alegado incumplimiento impugnó oportunamente la idoneidad de la PRTC para participar en el procedimiento formal de subasta.
Como parte del primer error, Centennial también sostiene que la Junta de Revisión no tomó en consideración el informe interno del DE que, según éste, evidencia que el DE y, por ende, la Junta de Subastas, conocía o debió conocer el historial de cumplimiento deficiente de la PRTC. Determinamos que dicho error no fue cometido.
En la resolución recurrida, la Junta de Revisión aseveró con razonabilidad que la Junta de Subastas no tuvo ante sí. la prueba documental mencionada por Centennial, y que la consideración de dicho informe conllevaba formular determinaciones de hechos que no estuvieron ante la consideración de la Junta de Subastas. Ciertamente, no tenemos ante nuestra consideración la conocida excepción al principio de la exclusividad del récord esbozada en 3 L.P.R.A. § 2163(d). Como se sabe, las agencias administrativas podrán tomar conocimiento oficial de todo aquéllo que pudiera ser objeto de conocimiento judicial por los tribunales acorde con la Regla 11 (A) de las Reglas de Evidencia 32 L.P.R.A. Ap. IV, R. 11 (A). Tampoco se trata de una situación en la que la agencia puede tomar conocimiento judicial de sus propios récords relacionados a litigios previos interrelacionados entre las mismas partes. J.R.T. v. Club Náutico, 97 D.P.R. 386, 391 (1969). En conclusión, a la luz del análisis precedente, determinamos que el primer error señalado no fue cometido.
El segundo error planteado por Centennial trata sobre la partida Número 7 de la subasta relativa al Servicio de Internet. Del expediente surge que Centennial fue excluida en la primera fase de la. evaluación de la subasta respecto a dicha partida, por razón de que no incluyó los costos de la partida Núm. 7 en su oferta y los englobó en otras partidas, no cumpliendo así con el requisito de solución completa para cada una de las partidas. En su análisis de las propuestas, la Junta de Subastas señaló, en particular, que Centennial, en vez de proveer la cifra requerida en la columna de costos para la partida Número 7, insertó en su lugar la frase “included in item ó”. 
Centennial, sin embargo, afirma haber cumplido con las instmcciones provistas, proveyendo una solución completa. Sostiene, además, que dicha exclusión fue hecha de forma “arbitraria y selectiva”. Solicitud de Revisión, págs. 17-18. Veamos.
Según surge del Apéndice sometido, el requisito de presentar una solución completa para cada una de las partidas cotizadas fue establecido desde la primera convocatoria de la subasta y se reiteró en la Convocatoria enmendada. Ambos “Requests for Proposal” (RFP) incluyeron una por una las condiciones e instrucciones generales que debían ser cumplidas, incluyendo una tabla adicional de resumen de costos al final del *997 procedimiento.
Como parte de este proceso, cada licitador debía indicar en una tabla si cumplía o no con cada una de las especificaciones allí listadas. Apéndice de la Recurrente, pág. 159. Al final de dicha tabla (especificación número 15), se requirió que los licitadores llenarán una tabla adicional titulada “Cost Summary Table”, incluida en el Apéndice 4 del RFP. Allí se indicó que: “This will be the cost information used to evaluate proposals, so great care must be placed in preparing this table.” (Enfasis nuestro). Apéndice de la Recurrente, pág. 113, RFP enmendado, a la pág. 14.
Centennial argumenta que dicha tabla de resumen de costos (Cost Summary Table) carecía de instrucciones sobre cómo ésta debía ser llenada. Solicitud de Revisión, pág.-18. Expresa que se creó ambigüedad por el hecho de que la tabla de resumen de costos indicaba que el costo total final (y no el de cada partida individual), sería el utilizado para considerar las propuestas. Por lo tanto, Centennial alega que no fue ella, sino la Junta de Subastas, quien provocó la situación que conllevó su exclusión como licitadora de la partida Núm. 7. Entendemos que no le asiste la razón a Centennial.
Centennial no puede ampararse en una sola expresión contenida en la tabla de resumen de costos a los efectos de hacer una cotización global para así aseverar que la Junta de Subastas impartió instrucciones ambiguas y que actuó arbitrariamente. La Junta razonablemente consideró su oferta sin cifra como una “no responsiva” y la descalificó de acuerdo al Artículo 50.8 del Reglamento. De ser ambiguas las expresiones de la Junta, lo que no nos parece, del propio expediente surge que en varias ocasiones, previas a la adjudicación de la subasta, los licitadores tuvieron la oportunidad de enterarse claramente de que la subasta requería una oferta de solución completa por cada una de las partidas. Dicho requisito se discutió primeramente en la reunión presubasta, y luego se reiteró a través de la página de Internet creada a esos efectos, por medio de las preguntas y respuestas entre los licitadores y la Junta de Subastas, razón por la cual la aseveración de Centennial no está apoyada por el récord. 
Además, advertimos que los requerimientos de la propia FCC son claros al indicar que los fondos federales para el programa E-Rate, (divididos en tres categorías según su prioridad, a saber, “Telecommunication Services”, “Internet Access”, e “Internal Connections”) serán considerados de manera individual. Véase Oposición de la PRTC a la Expedición de Auto de Revisión, pág. 11.
Así, la Junta de Revisión razonablemente determinó lo siguiente:
“No cabe duda que los licitadores en esta subasta son compañías con probada experiencia en el campo de las telecomunicaciones que conocen los requerimientos de estos programas. Casi podríamos decir que tienen un expertise en este campo superior a las propias unidades adquirentes. De igual manera, son asiduas participantes en los procedimientos de subastas, por lo que tienen amplios conocimientos de lo que significan los términos y condiciones de los pliegos de subasta y de los requerimientos de los programas Federales contra cuyos fondos ofrecen sus propuestas. Difícilmente pueden alegar ignorancia en estos procedimientos.” Resolución, a la pág. 15, Apéndice de la Recurrente, a la pág. 644.
Por último, Centennial alega que sufrió trato selectivo, pues la PRTC alegadamente también “englobó” los costos de su oferta para las partidas Núm. 5 y 6 sobre gastos de mantenimiento y servicios de transmisión, respectivamente; y sin embargo, la Junta consideró a la PRTC en su totalidad. Aduce que la PRTC, contrario a Centennial, no sufrió peijuicio alguno por esta acción, ya que la Junta no penalizó a la PRTC y comparó la propuesta de la partida Núm. 6 de PRTC contra la englobada de Centennial para las partidas Núm. 6 y 7. Solicitud de Revisión, pág. 19.
La PRTC aduce en su escrito de oposición que cotizó bajo el concepto de “end to end services”, donde todos *998 los componentes son parte de una solución de telecomunicaciones que incluye instalación, renta mensual, y el equipo necesario para el transporte de comunicaciones. Así pues, argumenta que no se trató de partidas englobadas, sino de un concepto utilizado por todos los proveedores de telecomunicaciones elegibles y avalado por la Universal Service Administrative Company, cuyas disposiciones federales son igualmente aplicables al proceso de subasta.
Considerados ambos argumentos, este tribunal reitera el criterio de que no intervendremos con las determinaciones administrativas, a menos que surjan de ellas claros indicios de irrazonabilidad o abuso de discreción. En este caso, entendemos que la omisión de Centennial en la partida Número 7 fue atribuible exclusivamente a ella y que no surgió de la Junta de Subastas o de la forma en que ésta impartió las condiciones y requisitos de la subasta. No podemos avalar el argumento de Centennial al efecto de adjudicársele a su favor la partida Número 7 de la subasta cuando fue descalificada por una omisión suya, no incluir la cotización de una partida.
Del expediente surge que la PRTC incluyó costos específicos para todas las partidas. Para la partida Núm. 7 en específico cotizó por $6,570,400.00, cosa que Centennial no hizo. Véase Aviso de Adjudicación, a la pág.4, Apéndice de la Recurrente, a la pág. 23.
Concluimos, por tanto, que el error no fue cometido y que la Junta de Revisión no actuó irrazonablemente al determinar que Centennial no cotizó la partida Número 7 de acuerdo a las normas establecidas.
Pasemos al tercer error planteado. Centennial aduce que la PRTC no cumplió con las especificaciones del RFP enmendado en cuanto a la partida Núm. 5 relativa a proveer apoyo técnico y mantenimiento al sistema, siendo el licitador el único punto de contacto entre las escuelas y el DE. Véase Apéndice de la Recurrente, pág. 110, Pliego de Subasta, pág. 14. Centennial aduce que la PRTC incumplió con lo requerido al “adiestrar a 23 empleados del DE para manejar una mesa de ayuda”, siendo alegadamente éstos, y no la PRTC, los puntos de contacto entre las escuelas y el DE. La recurrente se fundamenta en un flujograma sobre apoyo técnico provisto en la pág. 23 de su propuesta, Apéndice de la Recurrente, pág. 299.
Analizado tanto el flujograma como las secciones b-h de la propuesta de la PRTC, concluimos que Centennial no tiene razón. Consideramos que el hecho de que la PRTC apoye al DE en varios aspectos, como con la creación de una mesa de ayuda y el entrenamiento de 23 empleados para atenderla, no constituye un incumplimiento con la propuesta. Ello en ninguna forma altera el hecho de que la PRTC siga siendo el único punto de contacto entre las escuelas y el DE, según requerido. Tal como muestra el flujograma al que Centennial se refiere, el único punto de contacto sigue siendo el “VIP desk” compuesto exclusivamente de técnicos de la PRTC. En todo caso, la creación de una mesa de ayuda, lejos de transferir los costos al DE, agiliza y simplifica el apoyo técnico de la PRTC. Además, como bien señala la Resolución de la Junta de Subastas:
“No es que el personal de Departamento realizará el trabajo de PRT; por el contrario, este personal está capacitado para analizar la consecuencia del problema técnico que se presenta, por lo que está en mejor posición de establecer prioridades, hacer recomendación y presentar posibles remedios a corto plazo. La PRT tiene que asumir su rol de atención urgente a la respuesta técnica que implica la llamada de la escuela sin sujeción a que alguien del Departamento resuelva el problema. Es esa y no otra la intención que se rejleja en el flujograma a que hace referencia Centennial/’ (Enfasis nuestro). Apéndice de la Recurrente, pág. 647, Resolución recurrida, a la pág. 18.
Por último, debemos puntualizar que, contrario a lo alegado por Centennial, la PRTC estableció en su propuesta que sería el único punto de contacto en la prestación de los servicios. La creación y adiestramiento para la mesa de ayuda fue considerada como valor añadido {“added value”) a la propuesta y no como parte de la solución completa para la partida Núm. 5. Tanto la PRTC como - Centennial obtuvieron el máximo de la *999 puntuación (5 cada una) para dicho renglón, por lo que Centennial no puede alegar desventaja por ello.
Como parte del cuarto error, Centennial sostiene que la PRTC transfirió parte de los costos de mantenimiento a la partida Núm. 6 y a los gastos contingentes (“wiring contingency fees”) con el propósito de abaratar su oferta “artificialmente” en un total de $3,342,320.00 para la partida Número 5. Solicitud de Revisión, pág. 23.
Notamos del expediente que la cotización final de la PRTC para la partida Núm. 5 fue de $1,050,000.00; mientras que la de Centennial fue de $6,018,925.00. Centennial plantea que la cotización de la PRTC trataba del cableado solamente sin incluir el mantenimiento, según requiere la solución completa de dicha partida. También aduce que la PRTC escondió parte de los costos de mantenimiento a través de los gastos contingentes, la suma de costos contingentes (“wiring contingency fees”) por la suma de $1,219,371.00 en la sección 8.8 de la propuesta de la PRTC. 
La PRTC, por otro lado, argumenta que la partida Núm. 6 fue cotizada bajo el concepto de “end, to end service”, discutido anteriormente como un conglomerado de servicios de telecomunicaciones. Por otra parte, controvierte la alegación de que la cotización se redujo en virtud de la partida de gastos contingentes con el hecho de que esa partida no fue adjudicada, y por tanto, no pagada a la PRTC.
La Junta de Subastas ha reiterado que el único costo que consideró fue la cotización de $1,050,000.00 y que dicha cantidad es la única que la PRTC podrá reclamar al momento del pago. Ello nos lleva a concurrir con la Junta de Subastas, quien sostiene que, en todo caso, esconder costos sólo perjudica al propio Iicitador. A esos efectos, la Junta de Revisión concluyó en su resolución que: “la insinuación de Centennial que PRTC escondió los costos., a quien le afectaría es a la PRTC, quien quedaría obligada a realizar la labor por la suma cotizada”. Memorando de la Junta de Revisión en Oposición a Solicitud de Revisión, pág. 16.
En la resolución recurrida, además, se reitera la razonabilidad de la cotización de la PRTC. La misma fue menor que la cotización promedio entre todos los licitadores, cuyas ofertas fluctuaron entre $600,000.00 (NEC BSN) y $6,018,925.00 (Centennial). Finalmente, concluye la Junta de Revisión que la cotización de la partida Núm. 5, según la Junta de Subastas, cubrió los servicios de mantenimiento, y que aun incluyendo los gastos contingentes alegadamente escondidos según Centennial, la cotización de la PRTC resultaba aún más atractiva que las otras. La razonabilidad de tal razonamiento nos lleva a prestar entera deferencia a la Junta de Revisión.
Pasamos a discutir el último error planteado, donde Centennial argumenta que la Junta de Subastas debió evaluar las propuestas de la PRTC y Centennial tomando en consideración el costo total de las partidas Núms. 5, 6 y 7, según sometidas en la tabla de resumen de costos. Aduce que a la luz de los costos totales, Centennial ofrece “el mejor precio tomando en consideración los requisitos de capacidad que realmente requiere la red informática del DE para las escuelas.” Solicitud de Revisión, pág. 26.
En particular, Centennial discute ciertos elementos técnicos relativos a la capacidad y velocidad necesarios para el funcionamiento de la red del DE según requeridos por el plan de implementación del National Telecommunication and Information Administration (NITA) titulado “A Plan to Implement the E-Rate: Guaranteeing Universal Access to the National Information Infrastructure for All Schools and Libraries in America”. 
Centennial aduce que en vista de que el pliego de subasta requiere acomodar 50 usuarios concurrentes por escuela, el DE necesita al menos 1,280 kbps por escuela, es decir, al menos 1,283 líneas TI para servir la red de 1540 escuelas. Concluye Centennial que su propuesta:

“a. Proveerá mantenimiento, transportación de telecomunicaciones y servicio de Internet, a través de una red de 1540 TI, la cual 115,500 usuarios concurrentes a las escuelas por menos de $28 millones ($18,181.81 por 
*1000
TI). PRTC... propone ofrecer el mismo servicio con 56 TI...

b.... Si aplicamos la norma anterior a las ofertas presentadas, surge que PRTC ofreció 56 TI, mientras Centennial ofreció 1,540 TI, por lo cual PRTC tendrá que adquirir para manejar adecuadamente la red al menos 1,208 TI adicionales. Este costo adicional de $105,826,840 tendría que ser sufragado por el Departamento o correspondería a una orden de cambio que aumentaría astronómica e impermisiblemente el costo de la oferta de PRTC’. Solicitud de Revisión, pág. 27.
Alega Centennial que la diferencia en líneas TI, con las 56 TI de la PRTC para proveer a las 1540 escuelas, crearía un “embudo de información” y limitaría la rapidez o el ancho de banda accesible a cada escuela. Id.
La PRTC, por su parte, alegó que su propuesta es más segura, ya que el tráfico interno estaría libre de intentos de sabotaje o “hacking”. La propuesta de Centennial requeriría la instalación de equipos de seguridad adicionales o “firewalls” no contemplados en las especificaciones de la subasta. Alega además que su propuesta supera la de Centennial, ya que solamente el tráfico permitido por el DE accede de la Internet, contrario al caso de Centennial, cuya propuesta no propone una red interna para las escuelas y el DE, por lo que su comunicación sería a través de la Internet, siendo ello, según la PRTC, ineficiente y riesgoso. Oposición a Expedición de Auto de Revisión, pág. 15.
Respecto a las alegaciones de Centennial en cuanto a la cantidad requerida de líneas TI, PRTC alega que la misma es incorrecta, y refuta la alegación de que el informe de la NITA establezca estándares de conexión o parámetros para la conexión a Internet. También señala que en ningún lugar aparece el requisito de 20 kbps por usuario de computadora, pues la utilización de la red varía de acuerdo a la aplicación y necesidades informáticas del cliente.
La Junta de Revisión, por otra parte, afirma en su memorando de oposición ante nos que los extremos técnicos antes discutidos (sobre velocidad y líneas requeridas) fueron debidamente atendidos por el Comité Evaluador, como se recordará, compuesto por un grupo de profesionales cualificados para evaluar esta materia. Dicho comité estimó que el sistema de la PRTC era satisfactorio, y concluyó que las supuestas regulaciones de NITA no existen, sino que son un sinnúmero de recomendaciones que dicho organismo hizo a la FCC para la implantación del programa E-Rate. Afirma la Junta de Revisión que la Junta de Subastas actuó de forma razonable, limitándose a seguir las recomendaciones del Comité Evaluador.
Luego de un cuidadoso examen del expediente, consideramos que el proceso de subasta fue llevado a cabo dentro de un marco de razonabilidad. Este tribunal viene llamado a respetar dichas actuaciones, toda vez que el derecho nos impone prestar gran deferencia a procesos que, como este, requieren una gran sofisticación técnica y conocimiento altamente especializado.
y
Por los fundamentos antes expuestos, se expide el auto de revisión solicitado y se confirma la resolución de la Junta de Revisión emitida el 26 de junio de 2002, notificada el 27 de junio de 2002.
Lo acordó y manda el Tribunal y lo certifica la Secretaria General.
Aida Ileana Oquendo Graulau Secretaria General
ESCOLIOS 2003 DTA 49
1. Las partidas originales eran las siguientes: (1) Telecommunications Infrastructure for 103 locations, (2) Internal *1001 Connections for 103 locations, (3) Internet Access for 103 locations, (4) Technical Support/Maintenance for 1643 locations, (5) Telecommunication Transport Services for 1540 locations, (6) Internet Access Service for 1540 locations.
2. E-Rate es una tarifa preferencial para escuelas y bibliotecas del sistema educativo nacional, con el fin de éstas estar conectadas a la infraestructura de información nacional (National Information Infrastructure, Nil) de acuerdo á ciertos requisitos impuestos por la Comisión Federal de Comunicaciones. La subasta objeto de esta revisión corresponde al quinto año de la implantación del programa federal.
3. Véase párrafo 2 de la Resolución recurrida, Apéndice de la Recurrente, pág. 632.
4. Contrario a lo determinado por la Junta de Revisión en la resolución que nos ocupa, a los efectos de que nadie objetó las especificaciones y condiciones según enmendadas en el pliego de subasta, Centennial alegó haber impugnado. tales enmiendas mediante carta del 13 de diciembre de 2001 dirigida al Prof. Aníbal Cruz Pérez. Véase Apéndice de la Recurrente, pág. 31, Exh. B.
5. Estaba compuesto por el Ing. Paul Murphy, Especialista en Telecomunicaciones, el Sr. Danny Castro, Asesor de Programación, el Ing. Roberto Clausell, Asesor en Comunicaciones, la Sra. Sofía Moya, Consultora en Sistemas de Información, y el Ing. Daniel Carmona, Consultor en Tecnología de la Información.
6. La distribución de los 100 puntos es la siguiente:
1. Solución Propuesta (20)
a. Solución Conveniente y Funcional (10)
b. Garantía y Apoyo (5)
c. Otros (5)
2. Implantación (10)
a. Implantación (5)
b. Documentación (5)
3. Calificaciones del Proveedor (15)
a. Recursos (5)
b. Experiencia (5)
c. Otros (5)
4. Valor Añadido (5)
5. Costos (50)
7. Véase Apéndice de la Recurrente, pág. 637, Resolución Recurrida, pág. 8. Para el año I (1998-1999), PRTC obtuvo la buena pro para el transporte, equipo y acceso a Internet. DRC, otro suplidor, obtuvo el cableado. Para el año II (1999-2000), PRTC obtuvo el transporte y equipo y el acceso a Internet. DRC obtuvo el “Internet Bundle”, “Wireless Internal Connection” y los “Servers”. En el año 3 (2000-2001), la PRTC obtuvo las partidas de transporte, equipo y acceso y el mantenimiento del CPE (Costumer Premises Equipment). DRC obtuvo el “Internet Bundle” de la fase II y los “servers” de la fase I. Para el año IV, se adjudicó la continuación de las fases a los respectivos suplidores, y a DRC el “backbone” de la fase I.
8. Apéndice de la Recurrente, págs. 383-390.
*1002 9. Véase Apéndice de la Recurrente, pág. 635, Resolución Recurrida, pág. 6.
10. Arriaga v. F.S.E., supra, a la pág. 130.
11. Dichas expresiones se encuentran en el Apéndice de la Recurrente, pág. 448, Apéndice B-v del Informe.

“F. Beneficiary Site Selection

10. We performed site visits at the PRDOE Central Data Center and two selected schools: Bella Vista Elementary School and Dr. José M. Lázaro Senior High School.

11. We visited the two schools and, using the information contained within the corresponding PRTC Packing List (which listed the make and model of the equipment installed), performed the following:

a. We physically verified, without exception, that the equipment funded by the program existed.

b. We verified, without exception, the make and model for each item of equipment examined back to the PRTC packing list and invoice.

c. We verified, without exception, that the make and model of the equipment purchased and installed had not been substituted, based on physical observation of the equipment and verification to the details per the corresponding PRTC slip. ”

12. En cuanto a solución, la PRTC obtuvo una puntuación menor que Centennial en todas las partidas, a saber: 13.58 (PRTC) v. 15.32 (Centennial) en la partida 5; 14.23 (PRTC) v. 15.37 (Centennial) en la partida 6; y 12.42 (PRTC) v. 15 (Centennial) en la partida 7.
13. Las calificaciones del proveedor a su vez se subdividen en varios criterios a ser considerados, como recursos, experiencia y otros. En la partida 5, la PRTC obtuvo 11.67 v. 15 puntos otorgados a Centennial. En las demás partidas obtuvo la máxima puntuación en ese renglón junto a Centennial.
14. El Artículo 36 establece: “ La División de Compras del Departamento tendrá a su cargo mantener un Registro de Licitadores, con sus respectivas direcciones y teléfonos, que. incluirá a un número sustancial de los comerciantes, agricultores, productores o fabricantes, para cada renglón de bienes, obras o servicios, que hayan participado anteriormente en subastas o que puedan estar potencialmente interesados en licitar en las subastas formales del Departamento.” Asimismo, el Art. 36.4 (Requisitos para Formar Parte del Registro de Licitadores) dispone que: "... Todo proveedor interesado en formar parte del Registro de Licitadores, deberá completar el formulario que a tales efectos proveerá la División de Compras. Este incluye, entre otras cosas, datos sobre el nombre, dirección, número de seguro social patronal y otra información pertinente. Deberá cumplir además, entre otras, con las condiciones siguientes:
[[Image here]]
§36.4.6 Incluir una certificación notarizada, bajo apercibimiento de desacato o perjurio, de que no tienen deudas con el Gobierno por concepto de incumplimiento de contratos o contribuciones”. (Enfasis nuestro).
Por su parte, el Artículo 36.8 expresa, además, que: “Cada solicitud será evaluada para determinar que toda la información requerida por este Reglamento haya sido sometida y que cumpla con la ley y la ética. Dicha solicitud no será considerada hasta tanto todos los requisitos hayan sido cumplidos a cabalidad. La solicitud será evaluada, además, en términos de la capacidad de cumplimiento contractual, lo que no impide que para antes de incluirlo en el Registro y antes de adjudicársele una subasta, se le requiera a éste mostrar evidencia de que tiene facilidades suficientes y adecuadas para poder cumplir con las obligaciones del contrato. ”
15. Véase Apéndice de la Recurrente, págs. 640-41, pág. 11 y 12 de la Resolución Recurrida.
16. “El funcionario que presida la vista podrá tomar conocimiento oficial de todo aquéllo que pudiera ser objeto de conocimiento judicial en los tribunales de justicia”.
*1003 17. Véase Apéndice de la Recurrente, pág. 24, Aviso de Adjudicación, a la pág. 5.
18. Apéndice de la Recurrente, pág. 456, Réplica a Solicitud de Revisión por la Junta de Subastas, pág. 4.
19. Véase Apéndice de la Recurrente, pág. 99; pág. 3 de la RFP enmendada, que dice: “Each of the following sections requires a turnkey solution”.
20. Dicha tabla especificaba en el renglón del Total Final que la cantidad allí especificada por el licitador sería la usada para comparar los costos. RFP enmendada, a la pág. 28.
21. Las preguntas que discuten la cotización por cada partida son la 6, 8, 19, 27 y 46 se encuentran en www.de. gobierno, pr/ osiatid/eratefy5. htm.
22. “Technical Support- Provide technical support and maintenance to all communication equipment and wiring at 1540 existing schools and 103 new locations. Vendor will he the single point of contact for schools and PRDE.” (Enfasis nuestro).
23. Apéndice de la Recurrente, págs. 298-301, Propuesta de la PRTC, págs. 22-25.
24. Véase Apéndice de la Recurrente, pág. 298, Propuesta de la PRTC, pág. 22, línea 665.
25. Apéndice de la Recurrente, pág. 26, Aviso de Adjudicación de Subasta, pág. 7.
26. Apéndice de la Recurrente, pág. 308, Propuesta de PRTC, pág. 32.
27. Centennial señala que dicho informe requiere un promedio de 128 kbps (aproximadamente 25 kbps por computadora) para que cada escuela pueda operar con 5 computadoras navegando simultáneamente en la Internet. Las líneas TI proveen aproximadamente 1.5 mpbs (lmbps=l,000 kbps).